Thomas C. **POLLGREEN, et al.,**
**Plaintiffs-Appellees,**

v.

Raymond A. **MORRIS, District Director of the United States Immigration & Naturalization Service, et al., Defendants-Appellants.**

No. 84–5217.

United States Court of Appeals,
Eleventh Circuit.

Sept. 17, 1985.

Robert Kendall, Jr., Thomas W. Hussey, Office of Immigration Litigation, Civil Div., Dept. of Justice, Washington, D.C., for defendants-appellants.

Diane R. Tolbert, New York City, for plaintiffs-appellees.

Before RONEY and TJOFLAT, Circuit Judges, and BROWN *, Senior Circuit Judge.

JOHN R. BROWN, Circuit Judge:

Nineteen vessel owners, managing agents, and Captains ("vessel owners") of thirty fishing vessels participated in the "Cuban Refugee Freedom Flotilla" from April through June 1980. After their vessels were seized and fines were exacted by the Immigration and Naturalization Service ("the agency") the vessel owners challenged the agency's actions in the district court. The agency determined that duress was not a defense to the fines imposed under 8 U.S.C. § 1323. The district court concluded that duress was indeed available in mitigation and proceeded to make a determination of the applicability of duress as to each vessel owner. Finding that duress was clearly established in the record compiled before the agency and on the record before the district court, the court held that all fines be remitted and that the vessels be released free and clear of all liens. The agency challenges the district court's review of the agency's decisions. We affirm the district court's determination that duress is a defense to 8 U.S.C. § 1323; however, we reverse and direct the district court to remand each of the cases to the agency for the determination of whether or not duress is successfully made out in each case.

### Freedom Flotilla

In April, 1980, over 10,000 Cuban citizens sought sanctuary in the Peruvian Embassy in Havana, Cuba, claiming that they were political refugees. On April 14, 1980, President Jimmy Carter stated that the refugees in the Peruvian Embassy "who otherwise qualify may be considered refugees even though they are within their countries of nationality or habitual residents." [1]

---

* Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Presidential Determination No. 80–16 of April 14, 1980

 Specification pursuant to Section 101(a)(42) of the Immigration and Nationality Act (INA), as amended, and Determination pursuant to Sections 2(b)(2) and 2(c)(1) of the Migration and Refugee Assistance Act of 1962, as amended (the "Act"), authorizing the obligation of $4,250,000 in funds

 Memorandum for the Secretary of State

 Pursuant to Section 101(a)(42) of the INA as amended, I hereby determine, after appropriate consultation with the Congress, that special circumstances exist such that persons who have taken sanctuary in the Peruvian Embassy in Havana who otherwise qualify may be considered refugees even though they are still within their country of nationality or habitual residence.

 Pursuant to Section 207(b) of the INA as amended, I determine that an unforeseen emergency refugee situation exists, that the admission in response to the emergency refugee situation of 25 to 33 percent of the persons who have taken sanctuary at the Peruvian Embassy in Havana, up to a maximum of 3,500 refugees, is justified by grave humanitarian concerns and is otherwise in the national interest, and that the admission to the United States of these refugees cannot be accomplished under subsection 207(a) of the INA.

 In order to respond to the urgent humanitarian needs of those people in Cuba who have taken sanctuary at the Peruvian Embassy in Havana, I hereby determine pursuant to Section 2(b)(2) of the Act that it is in the foreign policy interests of the United States to designate such persons at this Peruvian Embassy as a class of refugees eligible for assistance under the Act. Pursuant to Section 2(c)(1) of the Act, I hereby determine that it is important to the national interest that up to $4,250,000 in funds appropriated under the United States Emergency Refugee and Migration Assistance Fund be made available to aid in the resettlement of these refugees.

 The Secretary is requested to inform the appropriate committees of the Congress of this determination and the obligation of funds under this authority.

An airlift was arranged to carry the Embassy refugees to San Jose, Costa Rica, to be processed for resettlement in the United States, Costa Rica, Peru, and other Latin American countries. Apparently, three days later, the Cuban government put an end to the airlift.

Beginning April 19, 1980, several vessels left Key West en route to Mariel Harbor, Cuba to pick up refugees. In response to the departures the Coast Guard broadcast a message to marine interests in the south Florida area advising that the transportation of aliens was in violation of the United States law and that violators may be arrested and vessels seized.[2] On May 5, 1980, President Carter stated in response to a reporter's question that "we'll continue to provide an open heart and open arms to refugees seeking freedom from communist domination and from economic deprivation, brought about primarily by Fidel Castro and his government."[3]

> This Determination shall be published in the Federal Register.
>
> /s/ Jimmy Carter
> THE WHITE HOUSE,
> *Washington, April 14, 1980.*

2. The Coast Guard broadcast the following message in English and in Spanish:

> All marine interests intending transit to Cuba for the purpose of transporting aliens to the United States are advised that this activity is in violation of U.S. law. Violators may be arrested and vessels seized.

3. CUBAN REFUGEES

> Q. I'm Marian Shapiro from Hayes, Kansas, League of Women Voters. I've been persuaded to ask this question by the Florida group. [*Laughter*] And I've been told by your aide that I can stop shaking, because you're a nice guy. [*Laughter*]
>
> THE PRESIDENT. If you'll be nice to me, I'll stop shaking, too. Okay? [*Laughter*] I hate to hear this one coming. [*Laughter*] Go ahead.
>
> Q. In light of thousands of illegal and legal immigrants arriving daily, a problem which is reaching critical proportions, what does your administration intend to do about enforcing current immigration laws and providing funds and programs for dealing with these newcomers, who are presently a great burden on local communities?
>
> THE PRESIDENT. The entire subject or issue or problem of the Cuban refugees has been greatly aggravated by the inhumane approach by Fidel Castro. We, as a nation, have always had our arms open to receiving refugees in accordance with American law. We now have more than 800,000 Cuban refugees in our country, who are making outstanding new American citizens, as you know.
>
> I have a responsibility to administer the law, because I've taken an oath to do so, and to administer it in a fair and equitable way. It's important for me, for instance, to treat the Cuban refugees with the same degree of compassion and understanding and with the same commitment to the law as we do the refugees from Haiti and from other countries. We are the most generous nation on Earth in receiving refugees, and I feel very deeply that this commitment should be maintained.
>
> Ours is a country of refugees. Many of those in this room have either parents or grandparents who were refugees who came here looking for a new life of freedom, a chance to worship as they pleased, or a chance to combine their own talents to build a growing and dynamic country. Those of us who have been here for a generation or six or eight generations ought to have just as open a heart to receive the new refugees as our ancestors were received in the past.
>
> I have organized within the White House, under a senior assistant, Jack Watson, a combined group of departments who are working on this special inflow of Cuban refugees. In the last few days we have received more than 10,000 from Cuba. We've now opened up a staging area at Eglin Air Force Base in the northwestern part of Florida, and we're receiving these refugees now, primarily into the Key West area.
>
> As you know, there are almost 400 of those who have been issued visas by our country who are hiding from mob violence instigated by Castro himself, and we're trying to get those freed by Castro to come on into our country. These are primarily former political prisoners. So, those 400 plus literally tens of thousands of others will be received in our country with understanding, as expeditiously as we can, as safely as possible on their journey across the 90 miles of ocean, and processed in accordance with the law.
>
> So, I don't know how else to answer your question except to say we're doing the best we can. I think the local and State officials in Florida have been extraordinarily forthcoming. We do have a need to go back to the Congress for additional funds to care for this unexpected influx of refugees. You can help here; the League can help. But we'll continue to provide an *open heart* and *open arms* to refugees seeking freedom from Communist domination and from economic deprivation, brought about primarily by Fidel Castro and his government.
>
> (emphasis supplied)

The mood in Washington seemed to change in early May, 1980. In his remarks to reporters announcing the policy toward the refugees on May 11, 1980, President Carter stated that (i) the United States was ready to begin an air and sea lift for screened and qualified people to come to the United States and "for no other escapees from Cuba," (ii) a family registration center will be opened in Miami, and (iii) that the Coast Guard is communicating with vessels en route to Cuba and those already in Mariel Harbor to urge them to return without accepting additional passengers. President Carter stated that no new trips to Cuba by the unauthorized vessels should be started. "Those who comply with this request or command will have nothing to fear from the law, but we will insure that the law is obeyed." [4] Furthermore, he stated that those violating the law by traveling to Cuba will be subject to civil fines and criminal prosecution and the vessels will be seized.[5]

Additionally, from May 14, 1980, through June 13, 1980, the Coast Guard broadcast another message stating that all vessels are advised to return to the United States ports and that they are subject to fines and possible seizures if they transport Cuban citizens in violation of U.S. immigration laws.[6]

In this case, nineteen owners of thirty vessels [7] departed [8] Key West, Florida for

---

**4.** White House statement on the Administration Policy Toward the Refugees, Weekly Compilation of Presidential Documents, Vol. 16, no. 20, May 14, 1980.

**5.** "I have directed the various law enforcement agencies to take additional steps as necessary to assure that this policy and the laws are obeyed." President Carter also stated that he instructed the Attorney General to commence exclusion proceedings immediately for criminals that Castro forced some of the boat owners to bring back to the United States.

**6.** The Coast Guard broadcast the following message:
ALL UNITED STATES CITIZENS IN CUBAN PORTS AND ENROUTE CUBA ARE ADVISED TO RETURN TO THE UNITED STATES AT THIS TIME. THE U.S. GOVERNMENT WILL ARRANGE ALTERNATIVE TRANSPORTATION FOR CUBAN CITIZENS DESIRING TO EMIGRATE THROUGH AN ORGANIZED SEA LIFT THAT WILL ENSURE SAFE AND ORDERLY TRANSPORTATION. VESSELS NOT UNDER CHARTER OR HIRE BY THE U.S. GOVERNMENT ARE SUBJECT TO HEAVY FINES AND POSSIBLE SEIZURE IF THEY TRANSPORT CUBAN CITIZENS IN VIOLATION OF U.S. IMMIGRATION LAWS. ALL U.S. BOATS IN MARIEL AND THOSE ENROUTE CUBA ARE ADVISED TO RETURN TO THE UNITED STATES WITHOUT DELAY.

**7.**

| Vessel | Vessel Owner |
| --- | --- |
| "Tom's Tub Too" | Pollgreen |
| "Rose Lee" | Roseman |
| "Iraida" | Hernandez |
| "Father and Son" | Vasquez |
| "Captain Henry" | Fernandez |
| "Thunderbolt" | " |
| "Skippie and David" | " |
| "Kraut & Cracker" | " |
| "Sun Hippie" | Foltz |
| "Sun Lioness" | " |
| "Miss To Nicey" | " |
| "Christina-M" | Pierce |
| "Melanie" | Rego |
| "Patsy Ann" | Trujillo |
| "Terry Lynn" | Montague |
| "Lamanda Louise" | Hickman |
| "Captain Jeffrey" | Weed |
| "Red Cloud" | Knowles |
| "D.J.&C." | Clark |
| "Sally Mae" | Stalls |
| "Crazy Horse" | McQuaig |
| "Winter Hawk" | " |
| "Captain J.H." | Foltz, as representative of the Morgan Estate |
| "Friskie" | " |
| "D B & S" | " |
| "R.A.M." | " |
| "Miss Sunbury" | " |
| "Rachel M." | " |
| "Key Wester" | Foltz, as manager |
| "Lone Wolf" | ". |

Data from *Pollgreen v. Morris*, 579 F.Supp. 711, 712 (S.D.Fla.1984).

**8.**

| | Departure Dates | |
| --- | --- | --- |
| "Tom's Tub Too" | April 30, 1980 | Pollgreen |
| "Rose Lee" | April 29, 1980 | Roseman |
| "Iraida" | May 8, 1980 | Hernandez |
| "Father and Son" | April 24, 1980 | Vasquez |
| "Captain Henry" | April 23, 1980 and May 4, 1980 | Fernandez |
| "Thunderbolt" | May 5, 1980 | " |
| "Skippie and David" | April 28, 1980 | " |
| "Kraut and Cracker" | May 5, 1980 | " |
| "Sun Hippie" | -undetermined- and | Foltz |

Mariel Harbor, Cuba from April 23, 1980, through May 8, 1980.[9] When the vessels returned to Key West, each vessel owner was served with a Notice of Intention to Fine Under Immigration and Nationality Act[10]. In addition, the vessels were seized by the United States Customs Service and U.S. Immigration and Naturalization Service. The owner or master of each vessel signed an "Agreement and Notice" which, according to the district court, created a "constructive seizure" of the vessel.[11] On June 4, and thereafter the vessel owners demanded the return of their vessels and in the alternative the vessel owners urged that they be permitted to secure the release of the vessels pursuant to the procedures in 8 C.F.R. 274.[12]

Apparently the vessel owners were advised by agency representatives that the vessels would not be returned and that 8 C.F.R. 274 was not available as a remedy. The vessel owners' recourse, according to the agency, was a challenge to the imposition of the fines under 8 C.F.R. 280.[13]

The vessel owners filed suit in the district court alleging deprivation of Fifth Amendment due process rights, seeking a declaration that the vessel seizures were unlawful and seeking an injunction permanently enjoining defendants from seizing the vessels or levying fines. Essentially,

### Departure Dates

| | | |
|---|---|---|
| | April 30, 1980 | |
| "Sun Lioness" | April 26, 1980 | " |
| "Miss To Nicey" | April 27, 1980 | " |
| "Christina-M" | April 26, 1980 | Pierce |
| "Melanie" | -unknown- | Rego |
| "Patsy Ann" | April 25, 1980 and May 5, 1980 | Trujillo |
| "Terry Lynn" | April 24, 1980 | Montague |
| "Lamanda Louise" | April 29, 1980 | Hickman |
| "Captain Jeffrey" | -unknown- | Weed |
| "Red Cloud" | April 26, 1980 | Knowles |
| "D.J.&C." | May 7 or 8, 1980 | Clark |
| "Sally Mae" | April 27, 1980 | Stalls |
| "Crazy Horse" | April 26, 1980 | McQuaig |
| "Winter Hawk" | April 25 or 26, 1980 | " |
| "Captain J.H." | April 23, 1980 | Foltz as representative of the Morgan Estate |
| "Friskie" | April 26, 1980 | " |
| "D B & S" | April 26, 1980 | " |
| "R.A.M." | April 25 or 26, 1980 | " |
| "Miss Sunbury" | April 25, 1980 | " |
| "Rachel M." | April 24, 1980 | " |
| "Key Wester" | April 24, 1980 | Foltz as manager |
| "Lone Wolf" | April 26, 1980 | ". |

Data from *Pollgreen,* 579 F.Supp. at 720.

9. Some dates are unknown, *see supra* note 8.

10. *See* Appendix at i. These notices refer to potential liability under 8 U.S.C. §§ 1321, 1323, 1324. The trial court pointed out that the agency abandoned its claims under § 1321 and § 1324 at the time of trial. *See infra* note 15.

11. The trial court determined in its memorandum opinion and preliminary injunction, 496 F.Supp. at 1048, note 7, that the agreement and notice created a "constructive seizure whereby the owner/operator/master retained the vessel in its care and custody for the sole power of maintaining and safeguarding the craft." The agreement, however, barred the use of the vessel.

12. 8 C.F.R. 274 provides for the return of a vessel improperly seized under 8 U.S.C. § 1324.

13. 8 C.F.R. 280 deals with the imposition and collection of fines when there is a violation of the Immigration and Naturalization Act. The fines imposed by the District Director are as follows:

| | | |
|---|---|---|
| Pollgreen | "Tom's Tub Too" | $ 30,000 |
| Roseman | * "Rose Lee" | 51,000 |
| Hernandez | * "Iraida" | 147,000 |
| Vasquez | "Father & Son" | 18,000 |
| Fernandez | "Captain Henry" | 226,000 and 128,000 |
| | * "Thunderbolt" | 224,000 |
| | "Skipper and David" | 72,000 |
| | "Kraut & Cracker" | 257,000 |
| Foltz | * "Sun Hippie" | 30,000 and 189,000 |
| | * "Sun Lioness" | 134,000 |
| | * "Miss To Nicey" | 232,000 |
| Pierce | "Christina-M" | 134,000 |
| Rego | "Melanie" | 20,000 |
| Trujillo | "Patsy Ann" | 230,000 and 169,000 |
| Montague | "Terry Lynn" | pending |
| Hickman | "Lamanda Louise" | 244,000 |
| Weed | * "Captain Jeffrey" | 178,000 |
| Knowles | * "Red Cloud" | 161,000 |
| Clark | * "D.J.&C." | 147,000 |
| Stalls | "Sally Mae" | 147,000 |
| McQuaig | * "Crazy Horse" | 299,000 |
| | "Winter Hawk" | 207,000 |
| Foltz/as representative of the Morgan Estate | "Captain J.H." | 10,000 |
| | "Friskie" | 167,000 |
| | "D B & S" | 143,000 |
| | "R.A.M." | 217,000 |
| | "Miss Sunbury" | 222,000 |
| | "Rachel M." | 131,000 |
| Plaintiff Foltz, as manager | "Key Wester" | 60,000 |
| | "Lone Wolf" | 176,000. |

* The Board of Immigration Appeals reduced fines in ten of the cases.

the relief the vessel owners sought was the return of their vessels for normal commercial fishing use.

The district court, after an evidentiary hearing, entered a preliminary injunction. *Pollgreen v. Morris,* 496 F.Supp. 1042 (S.D. Fla.1980). The injunction released the thirty vessels from any prohibition or use in lawful domestic fishing or shrimping operations. The order contained additional detailed instructions and administrative procedures for the vessel owners to follow.[14]

Thereafter the vessel owners pursued administrative remedies before the District Director. Fines were imposed in each case and administrative appeals were filed before the Board of Immigration Appeals (BIA) challenging fines levied under 8 U.S.C. § 1323.[15] Eighteen of the appeals were affirmed, eleven were sustained in part, one was remanded, one was pending, and no appeal had been taken in two cases at the time of appellate briefing. (*See* Appendix iii and *supra* note 13.)[16]

The District Director determined in these cases that duress was unavailable to an individual whose unlawful activities created the situation leading to duress. This conclusion is repeated verbatim in each case. (*See* Appendix iii—District Director's findings.) This rationale is probably the result of a memorandum written on October 7, 1980, by the Acting Commissioner of the INS addressed to the Regional Commissioner of the Southern Region: [17]

"The legal defenses of coercion and necessity should be specifically rejected. The law is clear that these defenses are not available if there was a reasonable, legal alternative to violating the law and thus to avoid the potential harm. *United States v. Bailey,* [444 U.S. 394] 100 S.Ct. 624, 635 [62 L.Ed.2d 575] (1980); see also *United States v. Richardson,* 588 F.2d 1235 ([9th Cir.] 1978). In the instant fine cases, the boat operators knew they were violating the law when they traveled to Cuba for the purpose of bringing back undocumented aliens, and they thereby created the situation of potentially being forced to bring back additional aliens. The only situation in which coercion would be a valid defense is if the boat operator can prove he left to pick up

**14.** *See* text of court's order, Appendix ii.

**15.** *See supra* note 13

**16.** Appendix iii, listing the case disposition with respect to each of the various vessels, has not been published with this opinion in the interest of space.

**17.** On September 3, 1980, the Acting Commissioner sent guidelines to the Regional Commissioner of the Southern Region. These guidelines applied different standards to vessel owners departing Key West before May 1, 1980:

Cuban Boatlift Program, Project 069

Regional Commissioner David Crosland
Southern Region Acting Commissioner

The following instructions and authorization relate to various aspects of the Cuban Boatlift Program, Project 069 at Miami.
*Fines*
The following guidelines will be followed when considering the imposition of fines under section 273(a) of the Act against persons bringing undocumented aliens from Cuba to the United States since April 21, 1980:
*Boat Departures from the United States Prior to Midnight, May 1, 1980*
(a) Fines will be imposed for each undocumented alien brought from Cuba to the United States whom the boat operator intended to bring to the United States when he departed for Cuba prior to midnight, May 1, 1980. In determining this number, factors such as the size of the boat and the amount of provisions aboard should be considered in evaluating the carrier's claim.
(b) Where a defense has been filed claiming duress or coercion the carrier will be interviewed under oath by an immigration officer to determine if the carrier was in fact coerced by the Cuban authorities into bringing additional aliens into the United States. If the immigration officer finds that such coercion did in fact take place, fines will be cancelled in full, as an exercise in prosecutorial discretion, for the number of aliens in excess of the number the carrier originally intended to bring. However, if the immigration officer finds that the carrier transported aliens to the United States for profit, the fines will be imposed for all undocumented aliens brought to the United States.
*Boat Departures from the United States after Midnight, May 1, 1980*
(a) Fines against carriers will be imposed in full for all undocumented aliens brought to the United States on boats which departed the United States after midnight, May 1, 1980.

only documented aliens and was forced to take back additional aliens. The boat operator would have the burden of proving that the aliens he went to get had documents."

The BIA, however, refused to recognize duress as a defense, stating that 8 U.S.C. § 1323 is a strict liability statute and that fines are imposed without regard to the vessel owner's intentions. (*See* Appendix iii—BIA findings.)

The vessel owners then challenged the imposition of fines before the district court. *Pollgreen v. Morris,* 579 F.Supp. 711 (S.D. Fla.1984). The agency moved for summary judgment asserting that the fines should be upheld and in the alternative, if duress was available as a defense, the cases should be remanded to the agency for findings consistent with that legal principle.

On June 11, 1981, the vessel owners moved for summary judgment and for a permanent injunction enjoining the enforcement of the claims asserted by the agency. The vessel owners argued that duress is a defense to liability under § 1323 [18] and that the agency should be permanently enjoined from enforcing or exacting fines and forfeitures pursuant to the statute.

The trial court granted the vessel owners' motion for summary judgment, released and discharged from constructive seizure all of the vessels seized and discharged each bond and released the conditions previously imposed by the preliminary injunction (*see* Appendix ii for conditions). The trial court made the preliminary injunction permanent insofar as it ordered and directed that each of the vessels constructively seized be returned to the rightful owner free and clear of all liens and claims arising out of this litigation. The court's decision was based upon its determination that (i) the failure of the agency to apply the defense was arbitrary and capricious and not in accordance with the law pursuant to 5 U.S.C. § 706 and (ii) that in any event, the vessel owners conclusively established uncontradicted defenses of duress and coercion for their actions which rendered the seizure of their vessels improper and entitled them to mitigation of fines assessed under 8 U.S.C. § 1323.

*Judicial Review*

The agency challenges the district court's review of the administrative decisions urging that (i) the district court's review is limited to the record established before the agency and (ii) that upon a determination that incorrect legal principles were applied, the district court should not have proceeded to a *de novo* determination of duress. The remedy, it is urged, is a remand for findings before the agency. The agency also argues that the agency was correct in determining that duress was not available in mitigation of the fines imposed under 8 U.S.C. § 1323.

The district court had before it the complete administrative records in each of the proceedings before the agency and testimony taken during the preliminary injunction hearing. The Court held as a legal proposition that the vessel owners were entitled to summary judgment based upon duress and coercion and that they were also entitled to relief even though the agency failed to pass upon the defense of coercion since the facts before the agency compelled, as a matter of law, such a finding. Essentially, the trial court found that duress was available as a defense and more important, that each of the nineteen vessel owners established before the agency duress as a matter of law. The Court determined that the agency's findings were arbitrary, capri-

---

**18.** Apparently, the agency abandoned its claims under §§ 1321 and 1324. *See* 579 F.Supp. at 714. The vessel owners, however, initially argued that 8 U.S.C. § 1321 addresses the landing of aliens at nondesignated ports of entry at a time or place other than as designated by immigration officers. The vessel owners argued that there is no doubt that the plaintiffs complied with all landing instructions and delivered all the refugees at a designated port of entry. As to § 1324, it was urged that the section deals with transporting aliens into the United States not lawfully entitled to enter except when the owner "was not at the time of the alleged illegal act a consenting party or privy thereto." The vessel owners argued that they acted under duress and therefore were not consenting parties.

cious, and an abuse of discretion, (*see supra*, Administrative Procedure Act, 5 U.S.C. § 706(2)(A)) since the "very record before the Board of Immigration Appeals and/or agency in each instance clearly supported the applicability of the defense of duress and coercion directly or through mitigation of fines as a matter of law." *Pollgreen*, 579 F.Supp. at 723.

■■■ We review the agency's decision pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.[19] At the outset we point out that the primary question before us (also before the district court and agency) is whether duress is available as a defense to 8 U.S.C. § 1323. Questions of law unlike questions of fact are freely reviewable by the courts. 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law...."); *Coca-Cola Co. v. Atchison T. & S.F. Ry. Co.*, 608 F.2d 213, 218 (5th Cir.1979); *see also Charter Limousine v. Dade Cty. Bd. of Cty. Com'rs.*, 678 F.2d 586, 588 (5th Cir. Unit B 1982). Whether duress is a defense presents a question of law. We have determined in two cases identical to the case at bar that duress and coercion may be, if established, a defense to the imposition of fines under 8 U.S.C. § 1323. *United States v. Blanco*, 754 F.2d 940, 942 (11th Cir.1985) (elements of duress not established by vessel owner); *United States v. Sanchez*, 520 F.Supp. 1038 (S.D.Fla.1981), *aff'd* 703 F.2d 580 (11th Cir.), *reh. denied,*

709 F.2d 1353 (11th Cir.1983) (we determined on rehearing in *Sanchez* that "it would have been absolutely futile for the appellees [vessel owners] to have raised a defense of duress or coercion in the administrative proceedings.") Although, because of the imprimatur later put on it by this Court, the district court was correct insofar as it determined that duress was defense to the statute, we conclude that the district court erred when it determined that duress was established as to each vessel owner.

■■■ When an administrative agency makes an error of law, our duty—and the district court's duty—is to correct that error of law and remand the case to the agency to afford it an opportunity to receive and examine the evidence in light of the correct legal principle. *NLRB v. Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine and General Pipefitters of New York, Local Union No. 638*, 429 U.S. 507, 522 n. 9, 97 S.Ct. 891, 900 n. 9, 51 L.Ed.2d 1, 15 n. 9 (1977) (*quoting Interstate Commerce Commission v. Clyde Steamship Co.*, 181 U.S. 29, 32–33, 21 S.Ct. 512, 513–14, 45 L.Ed. 729 (1901)).[20] Factual findings such as whether the vessel owners established the defense, are subject to the standards listed in 5 U.S.C. § 706(2). Factual questions may not be decided *de novo* by the district court unless (i) the agency's factfinding procedures are inadequate, or

---

**19.** 5 U.S.C. § 706 provides:
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 393.

**20.** An administrative decision based upon incorrect legal principles cannot stand. *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626, 636 (1943); *Kovac v. Immigration and Naturalization Service*, 407 F.2d 102, 104 (9th Cir.1969).

(ii) where issues not before the agency are raised to enforce certain agency actions. *Camp v. Pitts*, 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106, 110–11 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 92 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ Our review (and the district court's) is limited to the record compiled before the agency. *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15, 83 S.Ct. 1409, 1413–14, 10 L.Ed.2d 652, 657 (1963); *see also First National Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1374 (8th Cir.1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). Although the district court properly received testimony necessary to its determination on the preliminary injunction, *Pollgreen*, 496 F.Supp. 1042, it was in error to consider this evidence in its merits decision. ("This Court has heard extensive oral argument thereon and having now reviewed the entire record before this Court, including, but not limited to, the entire record in these Court proceedings, as well as the proceedings offered before INS. . . ." *Pollgreen*, 579 F.Supp. at 713.)

The vessel owners urge that the agency's factfinding procedures are inadequate without, however, stating the reasons for that inadequacy. We find no inadequate procedures. The administrative decisions in the cases were based upon an erroneous concept of the law, which we now correct.

■ The vessel owners also argue that there should be no remand in this matter since there is only one factual conclusion which could be reached, that is, duress as a matter of law, is established by the agency record as to each of the vessel owners. *See NLRB v. Wyman-Gordan Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709, 715 n. 6 (1969); *Citizen Band Potawatomi Indians of Oklahoma v. United States*, 391 F.2d 614, 624, 179 Ct.Cl. 473 (1967), *cert. denied*, 389 U.S. 1046, 390 U.S. 957, 88 S.Ct. 771, 1046, 19 L.Ed.2d 839, 1152 (1968). The court in *Citizen Band* discussed and quoted from the case of *The Spokane Tribe of Indians v. United States*, 163 Ct.Cl. 58, 70 (1963):

In the federal system it has been the usual rule that, where the reviewing court exposes the legal error in the decision of an administrative agency, it should not decide for itself those remaining issues within the agency's special competence, unless there could be only one answer; if the agency would have room to choose, the court should remit the case to allow that discretion to be exercised.

*Citizen Band*, 391 F.2d at 624. Based upon the records compiled before the agency we think that there at least may be room to choose. *See e.g. United States v. Blanco*, 754 F.2d at 943.

■ In *Blanco* we determined that in order to establish the defense of duress a party must show that he performed the unlawful act because (i) he was under an immediate threat of death or serious bodily injury, (ii) he had a well grounded fear that the threat would be carried out, and (iii) he had no reasonable opportunity to escape. *See United States v. Shapiro*, 669 F.2d 593, 596 (9th Cir.1982). We recognized that duress can also exist when a threat of immediate, serious harm is directed at a third person and a party acted unlawfully in order to protect the other party. *See United States v. Bailey*, 585 F.2d 1087, 1096–97 n. 29 (D.C.Cir.1978), *rev. on other grounds*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980).

Blanco, a fisherman residing in Key West, traveled to Mariel Harbor to pick up seven members of his family and return to the United States. After waiting for four days in Mariel Harbor, Blanco was told by the authorities that he had to take a boat load of refugees to the United States before his relatives would be allowed to board the vessel and return with him. Blanco left Mariel Harbor on April 26, 1980, with sixty Cuban Nationals aboard his vessel. He arrived in Key West where he was served with Form I–79, a Notice of Intention to Fine, by the immigration authorities. Blanco left for Cuba again to pick up

his relatives. On the second trip, Blanco was met by Cuban naval vessels and escorted to Mariel Harbor. Blanco waited in his vessel for over a month for his relatives to arrive. He then decided to leave and was told by authorities that he had to take a boat load of refugees. Blanco transported 43 refugees to Key West. He was again served with Form I–79, Notice of Intention to Fine. A fine of $43,000 was imposed.

In *Blanco*, we determined that under *Shapiro* the defense of duress was not established, either *as a matter of law* or of fact, since it was undisputed that Blanco intended *at the outset* to bring seven family members who were undocumented Cuban citizens into the United States. The elements of the defense, threats of immediate serious bodily harm or death remained unproven and more important, Blanco voluntarily returned to Cuba a second time. We concluded that even if Blanco were faced with duress and coercion, his conduct barred the defense since the defense is not available when a defendant has recklessly or negligently placed himself in a situation in which it was probable that he would be subject to duress. *See United States v. Agard*, 605 F.2d 665, 667 (2d Cir.1979).

We hold that the district court erred in proceeding to a *de novo* hearing, finding, or both, on the issue of duress as to the vessel owners. The district court erred in determining that the vessel owners established[21] as a legal proposition that each was subject to and under legal duress. Viewing the case as one not recognizing the defense of duress—which we have overruled—the agency had before it only *ex parte* affidavits (without any controvering facts) which naturally it did not even undertake to evaluate. On remand the agency has the burden of evaluating all the proferred evidence in the light of this opinion and *Blanco*. We direct the district court to remand these cases to the agency for rehearing, reconsideration, and redetermination of the individual cases on such new or further evidence as the agency in the first instance, deems appropriate on the issue of duress. In our supervisory role we emphasize that the proceedings before the agency should be held without delay[22] and expedited. Hopefully a system can be devised so that (i) a composite hearing with respect to common issues can be held while allowing (ii) facts peculiar to each vessel owner to be independently ascertained and determined with (iii) a single appeal with appropriate subparts to this Court.

VACATED and REMANDED to the INS.

---

**21.** *See* Appendix iii.

**22.** These cases are approximately five years old.

## APPENDIX i

UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service

## NOTICE OF INTENTION TO FINE UNDER IMMIGRATION AND NATIONALITY ACT

Fine No. 1 ( MIA 80 1359 ) Office Miami, Florida

District Miami File No. MIA 10/12 1640 Port of Key West, Florida

To Mr. Larry Foltz c/o Thomas J. Sireci Jr. Date October 23, 1980
614 Whitehead Street, Key West Florida 33040

Owner of the Vessel or Aircraft SUN HIPPIE

(Master, commanding officer, purser, person in charge, owner, agent or consignee) (Name of Vessel or Number of Aircraft)

Person or Persons Involved Cuban Nationals (SEE ATTACHED LIST) (189)

Pursuant to the provisions of Part 280, Title 8, Code of Federal Regulations, you are hereby notified that on the basis, of the evidence of record concerning the person (or persons) named above who arrived at the port of Key West, Florida on May 22, 1980 , ex SUN HIPPIE

(Name of Vessel or Number of Aircraft)

It is indicated that a fine should be imposed under section 273(b) of the Immigration and Nationality Act on the following grounds: For bringing to the United States from a place outside thereof any alien not in possession of a valid, unexpired visa when such visa was required under the Immigration and Nationality Act.

The circumstance under which the violation occurred are as follows: On May 22, 1980 your vessel SUN HIPPIE arrived at Key West, Florida from Mariel, Cuba. On board were 189 Nationals none of whom had a valid, unexpired visa for entry into the United States. This is in violation of Section 273(a) of the Immigration and Nationality Act.

You are hereby granted a period of 30 days from the service of this notice to file a written defense in duplicate under oath setting forth the reasons why a fine should not be imposed or if imposed why it should be mitigated or remitted. If the particular section of law provides for mitigation or remission. If you desire an opportunity for personal interview, your written defense must include a request for such interview. Evidence in support of your defense should be filed in duplicate with the written defense or, if personal appearance is requested, the evidence may be submitted at that time. If you request personal appearance you will be given an opportunity to be interviewed by an immigration officer for the purpose of presenting evidence concerning the alleged violation. You may be represented by counsel at such interview if you so desire. You may also submit a brief or other written statement in support of your contentions. The vessel or aircraft on which the alien (or aliens) arrived will be granted clearance papers when ready to depart and allowed to proceed upon the outward - bound voyage on condition that you deposit with the District Director of Customs at this port, prior thereto the sum of $189,000 dollars, or, where permitted by the Immigration and the Nationality Act, a bond with sufficient surety to secure payment of the fine should it be imposed.*

_____ Immigration Examiner (SIE)
(Name) (Official title)

Received the above notice at _____ on _____ 19__, at _____
(Place) (Date) (Time)

Per _____

I, Ethel Burdman , the undersigned, hereby certify that I have served original of the Notice of Intention to Fine under the Immigration and Nationality Act on the aforementioned part on October 23, 1980 at Miami, Florida by certified mail
(Date) (Place) (Method of service)

_____ Immigration Inspector
(Signature) (Title)

*When fine is imposed under Section 271 of the Immigration and Nationality Act, this sentence should be deleted

Form I-79
(REV.-5-15-70)

APPENDIX ii

ORDERED AND ADJUDGED as follows:

(1) Subject to the conditions set forth below, Plaintiffs' 31 vessels are released from any prohibition on use in lawful domestic fishing or shrimping operations. Prior to the vessels' use in such fishing or shrimping operations, Plaintiffs shall file with the Clerk of this Court as to each vessel involved, a bond in the nature of a personal surety bond in the amount of $30,-000 for vessels less than 65 feet, and in the amount of $50,000 for vessels exceeding 65 feet. Each personal surety bond shall be secured and collateralized by a valid, written security interest or lien in proper recordable form on the vessel involved, running in favor of the United States of America (both the bond and lien shall run in favor of the United States of America). The forms of bond and the recordable liens (Exhibit A) shall be submitted to any United States Magistrate in the Southern District of Florida, for review and approval, and shall thereafter be recorded in the office of and with the proper recorder of such instruments.

(2) The plaintiffs shall execute and properly record a preferred ships mortgage in the amount of $1.00 for any vessel not presently so mortgaged, and the owner or attorney for the owner shall certify to the magistrate that an earlier preferred ship's mortgage or a new $1.00 preferred ship's mortgage has been and is presently recorded against each vessel before the magistrate may authorize release of the vessel.

(3) With respect to each vessel, the plaintiffs shall maintain Hull Insurance and Protection and Indemnity Insurance in an amount equal to the full fair market value of the vessel, or at the owner's option, in an amount sufficient to pay off all outstanding mortgages, liens, security interests, and the amount of the fine noticed against the owner by the Immigration and Naturalization Service. The insurance coverage shall be pre-paid by the owners of the vessels, with appropriate loss payable clauses running in favor of the United States, as its interest in each vessel shall appear. Evidence that this insurance has been obtained shall be presented to the magistrate prior to release of the vessel.

(4) A magistrate may authorize one temporary ten day release of the vessel without full pre-paid insurance, if the vessel and its owner are in compliance with all other terms of this order, and if the owner or the owner's attorney certifies to the magistrate that an application for the required insurance has been made pursuant to the attached Exhibit B. At the conclusion of this ten day period, or sooner, the owner or his or her attorney shall submit to the magistrate evidence that the required insurance has been obtained. No vessel shall be permitted a second temporary release.

(5) No sale, transfer or other conveyance of title shall occur, nor shall any vessels' name, registration or vessel numbers be changed or altered (except to change state registered or unregistered vessels to Federally documented vessels), nor shall any equipment be removed from the said vessels. No vessel shall be mortgaged without prior approval of the court, except as provided in paragraph 2, above, with regard to the $1.00 mortgage.

(6) None of the vessels released pursuant to this order shall travel to Cuba or any foreign port.

(7) Each vessel shall be and remain home-based at that dockage under which the vessel was home-based prior to its voyage to Cuba.

(8) No vessel released under this Order shall be leased, chartered or hired out; nor shall any such vessel be given or loaned out to any third party, except that the owner may employ a captain or master and crew for domestic fishing upon compliance with the other provisions of this order.

(9) The owner of each vessel shall display under glass or clear water proof cover in the wheel house or cabin of his vessel a notice in both Spanish and English containing the exact text as set forth in the attached Exhibit C.

(10) Each owner of a vessel released under this order shall inform every person, including all crew members, who use or board a released vessel:

a) that operation of the vessel is restricted by court order;

b) that the vessel may only be used for domestic fishing;

c) that the vessel may not travel to Cuba or any other foreign country; and

d) that violation of these restrictions will subject the violator or violators to criminal prosecution, fines and/or contempt of court proceedings.

(11) Each vessel owner shall require the captain, master or other individual in command of a released vessel to execute, prior to taking command and sailing with the vessel, the attached Exhibit D. Each new captain, master or other person who takes command shall also be required to execute Exhibit D prior to taking command and sailing with the vessel. Each owner shall forward these certifications to the United States Customs Service at the address listed in paragraph 13.

(12) Prior to the initial release of a vessel, each owner shall certify to the magistrate:

a) that he has placed the notice required in paragraph 9 in the wheelhouse or cabin (Exhibit C);

b) that he has executed the personal surety bond and lien or security interest required in paragraph 1;

c) that he has had the captain, master or other person in command of the vessel execute the attached Exhibit D;

d) that he has or will inform the crew and other persons boarding the vessel of the restrictions on its use;

e) that he has obtained or applied for the insurance required by this order, as the case may be; and

f) that the vessel will not be used for any purposes other than domestic fishing, and will not travel to Cuban or any other foreign ports or waters.

(13) Each owner shall regularly report on the status of his compliance with the order, by completing the attached Exhibit E. The certified report, set forth in Exhibit E, shall be completed by each owner and mailed by certified mail to:

United States Customs Service

77 Southeast 5th Street

Miami, Florida 33131

Attn: Vessel Forfeiture

D. JONES

During the first month of release, this report shall be completed and mailed every two weeks after release. Thereafter, the report shall be prepared and mailed every month until further order of the court.

(14) No vessel released pursuant to this order shall leave its present berth until a United States Magistrate has issued a release order (see Exhibit F), which shall at all times be kept with and remain with the vessel's other documentation papers.

(15) Upon presentation of a copy of the magistrate's order to the United States Customs Service, the owner may remove the Customs notice of seizure affixed to the vessel, and may use the vessel under the limitations set forth in this order.

(16) Violations of the conditions of release set forth in this order will subject the plaintiff vessel owners to contempt of court.

(17) Nothing herein contained is intended to, nor shall it, alter, modify or change any lien in favor of the United States or any of its agencies authorized, created or granted by law, and nothing herein contained shall effect or alter any rights or remedies provided by law to the United States or any of its agencies, except as specifically modified herein.

(18) Nothing herein contained is intended to, nor shall it, alter, modify or change the administrative and/or judicial rights, remedies or defenses that the vessel owner(s) or captain(s) may have regarding imposition of fines under the Immigration and Nationality Act or removal of the liens provided for herein if they prevail regarding remission or mitigation of such fines.