**B.G. BUNYARD, Plaintiff,**

v.

**Donald P. HODEL, Secretary of the United States Department of Interior, Defendant.**

**No. CV–N–87–618–ECR.**

United States District Court, D. Nevada.

Dec. 8, 1988.

John P. Baker, Alturas, Cal., and Paul D. Elcano, Reno, Nev., for plaintiff.

Shirley Smith, Asst. U.S. Atty., Reno, Nev., for defendant.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

## I. STATEMENT OF THE CASE

The matter before the Court involves a dispute over the manner in which the Bureau of Land Management ("BLM") reduced grazing privileges in the Susanville District of California. Plaintiff and defendant each have moved for summary judgment in this matter. Both parties agree that the material facts are not in dispute. A summary of these material facts is necessary for an understanding of the instant action.

Plaintiff Bunyard is one of the two landowners with grazing permits in the High Rock Canyon/Massacre Mountain Unit of the Susanville land district. As of 1981, the BLM assigned approximately 25% of the grazing privileges in this unit to Bunyard and the remaining 75% of these privileges to a Mr. and Mrs. Earp (the "Earps"). These grazing privileges were apportioned in units of feed known as animal unit months ("AUMs").

In 1977, the BLM formed an ad hoc public advisory group for the purpose of studying the use and conservation of resources in several areas, including the High Rock Canyon/Massacre Mountain Unit. This group recommended that for environmental reasons, grazing should no longer be permitted in High Rock Canyon. Then, in early 1979, pursuant to Congress's enactment of the Public Rangelands Improvement Act, the BLM established the Modoc–Washoe Experimental Stewardship Program ("M–WESP"). The function of this program was to bring together members of the community and representatives of various government environmental organizations in joint land planning. In 1980, the Steering Committee of M–WESP echoed the ad hoc public advisory group's recommendation to limit grazing in High Rock Canyon.

The BLM accepted these recommendations and began to assess the appropriate method for implementing them. The BLM area manager of the High Rock Canyon/Massacre Mountain Unit initially concluded that cattle grazing should be excluded from High Rock Canyon, but that sheep grazing could continue without undue environmental damage. Since the Earps raised cattle and Bunyard raised sheep at this time, these guidelines would have reduced Earps' grazing privileges and not affected Bunyard. Environmentalist groups assailed these proposed guidelines, however, because they felt that domestic sheep grazing in this area would be detrimental to the establishment of a big horn sheep population. Consequently, the BLM withdrew this proposal and referred the matter back to the Steering Committee of M–WESP for further study.

The Steering Committee eventually referred this matter to its Executive Committee, which in turn referred it to a Technical Review Team ("TRT"). The TRT was composed of plaintiff Bunyard, a representative of the Earps, and a number of representatives from the BLM, the Soil Conservation Service, and a variety of other government and private environmental organizations. After much study and debate, all the members of the TRT agreed that the grazing privileges in the High Rock Canyon/Massacre Mountain Unit should be reduced by 22% of the existing AUMs. The TRT also recommended, with Bunyard's approval, that this reduction be borne by Bunyard and the Earps in proportion to their current division of AUMs, with the Earps suffering about 75% of the reduction and Bunyard bearing about 25% of it. When this recommendation was presented to the Steering Committee of M–WESP, however, Bunyard objected and argued that the Earps should bear the entire reduction. Nevertheless, the Steering Committee endorsed the proportionate reduction recommendation to the BLM district manager in charge of the High Rock Canyon/Massacre Mountain Unit.

The BLM district manager, Mr. Cleary ("Cleary"), adopted the recommendation of the TRT as the basis of the BLM's proposed decision for reducing the grazing privileges in High Rock Canyon. Bunyard formally protested the proposed proportionate reduction in his grazing privileges pursuant to 43 CFR § 4160. Nevertheless, in a final decision issued on April 14, 1983, district manager Cleary dismissed Bunyard's protest and ruled that any reduction in grazing privileges would be borne proportionately by Bunyard and Earp.

Bunyard appealed the BLM's final decision to the Hearings Division of the United States Department of the Interior. Through written briefs and an evidentiary hearing before an administrative law judge ("ALJ"), Bunyard argued two points. First, he argued that BLM's final decision and M–WESP's final recommendation were based on an erroneous interpretation of the controlling CFR provision. Secondly, he advanced several reasons for applying the controlling CFR provision in a manner that would force the Earps to bear the entire reduction in grazing privileges. In a decision dated November 1, 1984, the ALJ denied Bunyard's appeal. Bunyard then appealed the ALJ's decision to the Interior Board of Land Appeal ("IBLA") of the United States Department of the Interior. The IBLA affirmed the ALJ's decision on March 12, 1987.

Bunyard now turns to this Court for relief from the BLM's decision. In his motion for summary judgment, Bunyard presents only the first of the two claims that he argued before the ALJ and the IBLA. Bunyard argues here that the BLM based its final decision on an incorrect interpretation of the controlling CFR provision. He does not argue that the only permissible interpretation of this regulation required the BLM to allocate the entire reduction in grazing privileges against the Earps. Hence, the limited role of this Court is to interpret the controlling CFR provision and determine whether the BLM's final decision in this matter rested on an erroneous interpretation of that regulation.

## II. APPLICABLE LEGAL STANDARDS

■ The standards for judicial review of agency action are codified in 5 U.S.C. § 706. This section provides in pertinent part that:

The reviewing court shall— ...

(2) hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

5 U.S.C. § 706. Numerous Courts of Appeals have held that an agency's failure to interpret properly and to comply with applicable CFR regulations constitutes arbitrary and capricious conduct that is not in accordance with the law. Where such agency misconduct occurs, the proper remedy is to vacate the agency decision at issue and remand the matter to the agency for action in accordance with the applicable regulations. *See, e.g., Marshall v. Lansing,* 839 F.2d 933, 943 (3d Cir.1988); *American Petroleum Inst. v. Environmental Protection Agency,* 787 F.2d 965, 976–77 (5th Cir.1986); *Pollgreen v. Morris,* 770 F.2d 1536, 1544–45 (11th Cir.1985).

■ Furthermore, an agency cannot justify its action through *post hoc* rationalization. The United States Supreme Court has stated that "the validity of an agency's determination must be judged on the basis of the agency's stated reasons for making that determination." *Industrial Union Dept., AFL–CIO v. American Petroleum Inst.,* 448 U.S. 607, 631 n. 31, 100 S.Ct. 2844, 2858 n. 31, 65 L.Ed.2d 1010 (1980). Consequently, "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *Securities and Exchange Comm's v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 456, 87 L.Ed. 626 (1943). Thus, if an agency reaches a proper decision on improper grounds, its decision must be vacated.

■ The regulation that governs the dispute in the case at bar is 43 CFR § 4110.4–2. This regulation provides that:

(a) Where that is a decrease in public land acreage available for livestock grazing use within an allotment, grazing permits or grazing leases and grazing preferences shall be canceled in whole or in part. The cancellations will be *equitably apportioned* by the authorized officer or as agreed to among authorized users and the authorized officer.

43 CFR § 4110.4–2(a) (1987) (emphasis added). Prior to the enactment of this regulation in 1978, the applicable regulation required the implementation of a decrease in grazing privileges to be "on an equal percentage basis." *See* 43 CFR § 4111.4–3(a)(3) (1977).

Thus, a major shift has occurred since 1978 in the regulatory regime governing the decrease of grazing privileges on a common allotment. Whereas the regulation in effect prior to and during 1978 mandated a proportionate share reduction among the common users, the current regulation grants the BLM significant discretion in allocating the reduction. The current regulation allows the BLM to negotiate an agreement among the authorized users of the grazing privileges or to order an "equitable" reduction among the authorized users. The term "equitable" is broadly defined as meaning "[j]ust, fair and right, in consideration of the facts and circumstances of the individual case." *Black's Law Dictionary* 632 (4th ed. 1968). Consequently, the current regulation allows the BLM to examine the circumstances surrounding the reduction of public grazing privileges on a case-by-case basis and to allocate the reduction among the common users in a fair manner. While a proportionate share reduction might constitute an equitable apportionment in many cases, the BLM is no longer required to mechanically apply this rote proportionate formula to all situations.

## III. CONDUCT OF THE BLM

█ The conduct of the BLM in the instant case reveals that it failed to properly interpret 43 CFR § 4110.4–2(a). Rather than utilizing the discretion accorded it under this regulation, the BLM incorrectly read this regulation as *requiring* a propor-

tionate share reduction. This misinterpretation is apparent in the BLM's final decision, issued by District Manager Cleary on April 14, 1983. In that decision, the BLM cites 43 CFR § 4110.4–2(a) and states that "[p]ursuant to our regulations, any adjustments [to grazing privileges] shall be on a proportionate basis unless agreed upon otherwise." Final Decision of BLM District Manager of the Susanville District, at 3 (April 14, 1983).

District Manager Cleary confirmed his mistaken impression regarding the governing CFR provision through his testimony before the ALJ. In response to the question as to why he ordered a proportionate share reduction of Bunyard's and the Earps' grazing privileges, he replied as follows:

> Well, in my career with the Bureau I have gone through a lot of adjudications similar that occurred in the early 1960's and I was raised to understand that there was no other way to do business other than by proportionate share. If you deviated from that, you raised all kinds of specters that simply couldn't be defended and the only way to be, to follow the body of law and the body of judicial decisions that have been rendered was in fact to proceed on the basis of proportionate share and I proceeded that way here.

*Bunyard v. Bureau of Land Management*, CA–02–83–2, Reporter's Transcript at 62:3–11 (Hearing Division of the United States Dep't of the Interior Nov. 9, 1983) (hereinafter cited as RT). Furthermore, on cross-examination, Cleary testified that he had "no choice under [his] interpretation of the regulations but to distribute the reduction on a proportionate basis." *Id.* at 62:20–24.

The evidentiary record made before the ALJ also reveals that the BLM's misinterpretation of 43 CFR § 4110.4–2(a) tainted the entire advisory review process conducted by the BLM. The area manager of the BLM testified that both the Steering Committee and the TRT of M–WESP were informed that in the absence of an alternative solution agreed to by Bunyard and the

Earps, the grazing privileges had to be reduced on a proportionate basis. *Id.* at 40:19–26; 41:5–14. In addition, the BLM advised Bunyard that unless he reached an alternative agreement with the Earps, the BLM was required by law to order a proportionate reduction in grazing privileges. *Id.* at 64:7–14.

The BLM cannot justify its incorrect interpretation of 43 CFR § 4110.4–2(a) by arguing that its decision to proportionately reduce Bunyard's and the Earps' grazing privileges fell within the "equitable apportionment" mandate of the regulation. First of all, the law does not authorize *post hoc* rationalizations for agency decisions. "A reviewing court must judge the propriety of an agency's actions solely on the grounds invoked by the agency." *Tongatapu Woodcraft Haw., Ltd. v. Feldman,* 736 F.2d 1305, 1308 (9th Cir.1984) (citing *Federal Power Comm'n v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974)). The final decision of the BLM and the BLM district manager's testimony clearly shows that BLM based its decision on a misinterpretation of 43 CFR § 4110.4–1(a) rather than on a reasoned analysis of what constituted an "equitable" apportionment. The BLM cannot justify this analytical error through its after-the-fact argument that its misinterpretation resulted in a proper outcome.

Nor can the BLM argue that their analytical error was harmless. The BLM area manager testified before the ALJ that he felt allocating all of the reduction in grazing privileges to the Earps was fair under the circumstances existing in 1981. RT at 39:14–26. The area manager subsequently changed his mind, however, because he erroneously determined that the controlling regulation required a proportionate share reduction in the absence of an agreement to the contrary. *Id.* at 39–40:27–14. This testimony shows that the BLM's incorrect interpretation of 43 CFR § 4110.4–2(a) played a significant role in shaping its final decision. Thus, the doctrine of harmless error is inapplicable.

This Court expresses no opinion, however, as to whether a proportionate share reduction in grazing privileges would be a valid solution in this matter under a proper interpretation and application of 43 CFR § 4110.4(2)(a).

## IV. CONCLUSION AND JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 321–23, 106 S.Ct. 2548, 2551–53, 91 L.Ed.2d 265 (1986). The case at bar is ripe for disposition through summary judgment because, as both parties agree and this Court finds, no issues of material fact are in dispute. The issue before the Court simply involves a legal challenge to the validity of the BLM's decision-making process in this matter. For the reasons presented in the preceding sections of this Order, we hold that the BLM's final decision in this matter was flawed because it was based largely on an erroneous interpretation of the controlling CFR provision.

IT IS, THEREFORE, HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (document # 12) is GRANTED and that Defendant's Motion for Summary Judgment (document # 11) is DENIED.

ACCORDINGLY, IT IS ORDERED that the Bureau of Land Management's Final Decision, dated April 14, 1983, regarding the division of future adjustments in grazing privileges between Bunyard and the Earps is VACATED.

IT IS FURTHER ORDERED that this matter be REMANDED to the Susanville District of the Bureau of Land Management so that the BLM may initiate its decision-making process in this matter in accordance with a proper interpretation of 43 CFR § 4110.4–2(a).

The Clerk shall enter judgment accordingly.