Dewey L. LYDEN, M/V "BORN AGAIN" et al., Plaintiffs-Appellees,

v.

Joe D. HOWERTON, Director of United States Immigration and Naturalization Service, Edward F. O'Connor, Harvey W. Carnes and Robert N. Battard, Defendants-Appellants.

Richard BRULAND, Raymond Bruland, Vance Hager, and William Baldwin, Plaintiffs-Appellants,

v.

Joe D. HOWERTON, District Director of Immigration and Naturalization Service, Edward F. O'Connor, Regional Director of Immigration and Naturalization Service, Harvey W. Carnes, District Director United States Customs Service, and Robert N. Battard, Regional Director United States Customs Service, Defendants-Appellees.

Nos. 84–5681, 85–5321.

United States Court of Appeals, Eleventh Circuit.

March 12, 1986.

---

Robert Kendall, Jr., Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., Stanley Marcus, U.S. Atty., Miami, Fla., for defendants-appellants.

Alfred K. Frigola, Frigola, DeVane & Wright, P.A., Marathon, Fla., for plaintiffs-appellees and plaintiffs-appellants.

Stanley Marcus, U.S. Atty., Robert Rosenberg, Asst. U.S. Atty., Miami, Fla., Robert Kendall, Jr., Office of Immigration Litigation, Civil Div., Washington, D.C., for defendants-appellees.

Before VANCE and HATCHETT, Circuit Judges, and SWYGERT,* Senior Circuit Judge.

VANCE, Circuit Judge:

This is a consolidation of two cases involving some sixteen plaintiffs, all boat owners or captains (hereafter fishermen or owners). They sued in the district court for the southern district of Florida to challenge the seizure of their boats and the imposition of substantial fines by the Immigration and Naturalization Service (INS) pursuant to 8 U.S.C. § 1323. All were fined for bringing Cuban refugees without visas to the United States during the "Freedom Flotilla" of April to June 1980. During that time hundreds of private boats brought more than 100,000 Cubans to the United States.

## I.

Upon the return of these boats from Cuba, each of the plaintiffs below was served with a Form I–79, Notice of Intent to Fine, in the statutory amount of $1000 per undocumented alien transported on their boats.[1] Fines ranged from $4,000 to $181,000. The boats were also constructively seized, meaning that the owners retained possession and were allowed to maintain the boats but not to use them. The fishermen pursued their administrative remedies under 8 C.F.R. 280 by filing written objections and briefs with the INS district director. They each took advantage of the fifteen minute personal appearance permitted them. They were not allowed to be represented by counsel in the personal appearance nor were they allowed to call witnesses. Upon confirmation of the fines

by the district director they appealed to the Board of Immigration Appeals (BIA), which found that there was no misconduct by INS to justify estopping the agency from fining the fishermen and that the defense of duress was unavailable to the fishermen because 8 U.S.C. § 1323 is a strict liability statute under which the state of mind of the violator is irrelevant. The BIA also found that even if duress were available in mitigation the owners forfeited that right by going to Cuba to perform an illegal act, thereby placing themselves in the danger of duress. *Matter of M.V. Solemn Judge,* Interim Decision 2894 (B.I.A. 1982).[2] The BIA thus dismissed the fishermen's appeals.

The fishermen then sued in district court, one group prevailing and the other losing. In case no. 84–5681 (*Lyden*) the district court, King, C.J., after an evidentiary hearing held at the request of the government, found that the INS was estopped from enforcing 8 U.S.C. § 1323 against the owners because of INS' behavior during the boatlift, that the INS improperly ruled out duress as a defense to penalties under section 1323, and that duress had been established as a matter of law by the facts in the administrative record and those adduced at trial.[3] In case no. 85–5321 (*Bruland*) the district court, Nesbitt, J., also found that INS improperly ruled out duress as a matter of law, but found that estoppel had not been established and that plaintiffs had forfeited a duress defense by the very act of going to a totalitarian country to bring back undocumented aliens to the United States. We affirm both courts' determination that duress is a defense to violations of 8 U.S.C. § 1323. We conclude, however, that both courts' factual findings were premature and thus direct the courts to re-

---

* Honorable Luther M. Swygert, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Where the owner and the captain were different people, both were to be fined.

2. *Solemn Judge* is the basic decision on which the agency relied for its decisions in all these cases and for convenience will stand for all those decisions.

3. Judge King's findings of fact are included in an appendix to this opinion.

mand the cases to INS for action consistent with this opinion.

## II.

 It is now the settled law of this circuit that duress is available as a defense to violations of 8 U.S.C. § 1323. *Pollgreen v. Morris*, 770 F.2d 1536, 1538 (11th Cir. 1985); *see also United States v. Blanco*, 754 F.2d 940 (11th Cir.1985); *United States v. Sanchez*, 520 F.Supp. 1038, 1040–41 (S.D. Fla.1981), *aff'd*, 703 F.2d 580, *on denial of rehearing*, 709 F.2d 1353, 1353 (11th Cir. 1983). The court in *Lyden* found that duress had been made out as a matter of law from the facts in the administrative record and those adduced in the trial below. The INS, however, had failed to contest any of the evidence adduced by plaintiffs in the administrative proceedings because of its erroneous belief that section 1323 is a strict liability statute without defense. Under the APA the ordinary procedure when faced with facts found under a wrong interpretation of the law is to remand to the agency to give it a chance to apply the correct standard. *Pollgreen*, 770 F.2d at 1544 (citing *NLRB v. Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & General Pipefitters, Local Union No. 638*, 429 U.S. 507, 522 n. 9, 97 S.Ct. 891, 900 n. 9, 51 L.Ed.2d 1 (1977)). Factual questions are not decided de novo by the district court unless (i) the agency's factfinding procedures are inadequate [4] or (ii) issues not before the agency are raised to enforce certain agency actions. *Id.* at 1544–45 (citing *Camp v. Pitts*, 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).[5] We therefore order these cases remanded to the INS to make individual findings under the correct standards on the defense of duress.

In *United States v. Blanco*, 754 F.2d at 943, we determined that to establish a defense of duress a party must show that he or she performed the unlawful act because he or she (i) was under an immediate threat of death or serious bodily injury, (ii) had a well grounded fear that the threat would be carried out, and (iii) had no reasonable opportunity to escape. In a mass situation such as this, to meet those requirements it is not necessary that each owner prove that he or she individually attempted to run the Cuban blockade or looked down the barrel of a rifle. It suffices that such events occurred within their knowledge and that it would have been futile for them to attempt to leave against the will of the Cubans.

 The INS in *Solemn Judge* has also maintained that the owners can claim duress only in mitigation and only if they can prove the aliens they intended to pick up would have had proper documents. That is an incorrect standard and must not be used in the review of these cases. The owners would have violated no law until they voluntarily picked up undocumented aliens. They had therefore violated no law in entering Mariel Harbor. If the owners were forced to take on improperly documented aliens in Mariel Harbor, they will have proven a complete defense of duress unless the INS can prove they knew or should have known the illegality of their acts while they still had the opportunity to avoid performing them. *Cf. Blanco*, 754 F.2d at 943 (duress defense not available where defendant went to Cuba *intending* to pick up *undocumented* aliens). The INS argument that the owners failed to use due

---

4. Whether INS' factfinding procedures are adequate for a case like this where substantial quasi-criminal fines are involved has not been directly raised, and we express no opinion on it. The finding in *Pollgreen*, 770 F.2d at 1545, to the contrary does not close the question, since that finding was based on the fact that the plaintiffs there stated no reasons to support their assertion that the procedures were inadequate.

5. Although the *Blanco* and *Sanchez* courts did not order a remand to the INS, the question of the appropriate remedy was not specifically considered in those cases. We believe that *Pollgreen*, in which the issue was discussed at some length, represents the controlling statement of the law.

diligence in ascertaining the status of the aliens they picked up is also specious. The conditions in Mariel made checking documents very difficult. In addition, if the fishermen succeed in proving duress they will have established that they had no choice but to take the passengers on board, meaning that even the most thorough document check would have been futile.

■ In the case of Bruland and his companions the district court correctly found duress to be a defense to 8 U.S.C. § 1323. The court, however, relied on *Blanco* to hold that the fishermen forfeited that defense since it is not available to one who has "recklessly or negligently placed himself in a situation in which it was probable that he would be subject to duress." 754 F.2d at 943. *Blanco*, however does not control this situation. In that case, Blanco was contesting fines received for a *second* trip to Mariel Harbor. He had already been forced to take on a load of refugees on a first trip, so that on the second one he had actual knowledge of the coercion in Mariel. The mere fact that Cuba is a communist country or has gunboats outside its harbor is not itself sufficient to support a finding that the owners placed themselves negligently or recklessly in danger of coercion. Neither in Cuba nor anywhere else is forcing unwanted passengers onto a boat a common enough practice to make entrance into a harbor a reckless or negligent act. Because a duress defense cannot be ruled out as a matter of law and because the district court cannot properly make that finding of fact when the INS has not done so, case no. 85–5321 must also be reversed and remanded to the INS to consider the duress defense according to the standards above.

■ Both district courts made factual findings on the question of government estoppel, the *Lyden* court finding it and the *Bruland* court not. Judge King in his opinion found that the INS was responsible for the actions of Customs and Coast Guard officers who were its agents in administering the boatlift in Florida. We hold that Judge King is correct and that the INS must be charged with the actions of Customs and the Coast Guard in this situation. The INS in *M.V. Solemn Judge* stated that Customs had no legal duty to warn the fishermen seeking clearance that their stated goal was illegal and that they faced fines if they returned with undocumented aliens. It also stated that the failure to refuse clearance was irrelevant because under 19 C.F.R. § 4.61 clearance could not be denied absent a statutory violation. To the contrary, we find that the provisions of 19 C.F.R. § 4.61(b)(24) & n. 100b, which forbid issuance of clearance to vessels not in compliance with 8 U.S.C. § 1323 and 8 C.F.R. 280, in conjunction with the massive confusion and conflicting statements by federal authorities, *see Pollgreen*, 770 F.2d at 1538–40, created a duty to warn functionally equivalent to a statutory or regulatory duty to warn such as that discussed in *Corniel-Rodriguez v. INS*, 532 F.2d 301, 306–07 (2d Cir.1976). Such a duty to warn against possible law violations might ordinarily place upon agents the unbearable burden of guessing applicants' intentions. Here, however, the agents easily could have warned the fishermen. The agents were charged with enforcement of 8 U.S.C. § 1323 and were fully aware of the confusion and excitement about rescuing refugees. In addition, the owners stated the purpose of their journeys. Under these circumstances, to relieve the agents of the burden of warning could very well endanger the "interest of citizens in some minimum standard of decency, honor and reliability in their dealing with their Government." *Heckler v. Community Health Services*, 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). It is not at all clear whether the owners can prove sufficient affirmative misconduct on the part of INS or its agents to require this circuit to decide whether to adopt the affirmative misconduct exception to the refusal to estop the government in its sover-

eign activities.[6] We must, however, order these cases remanded to INS to give the owners the chance to prove their charges of misconduct without regard to INS' incorrect legal determinations concerning the relationship of the Coast Guard and INS and concerning the duty of Coast Guard and Customs personnel to clarify the owners' legal obligations. We, of course, express no opinion on the merits of the owners' estoppel claims. Cases no. 84–5681 and 85–5321 are vacated and returned to their respective district courts with instructions that they be remanded to INS for factual determinations under the correct legal principles. We repeat and adopt the admonition of *Pollgreen v. Morris* that the proceedings before the agency should be held without delay and expedited. "Hopefully a system can be devised so that (i) a composite hearing with respect to common issues can be held while allowing (ii) facts peculiar to each vessel owner to be independently ascertained and determined with (iii) a single appeal with appropriate subparts to this Court." 770 F.2d at 1546.

VACATED and REMANDED to the district courts with instructions that the cases be REMANDED to the INS for proceedings consistent with this opinion.

## APPENDIX

### Findings of Fact

In late April, 1980, Mrs. Katherin [sic] Gaines was the head bookkeeper at Keys Fisheries in Marathon, Florida. As the Mariel exodus began to unfold families hopeful of obtaining the passage of relatives from Mariel to Florida descended upon Ms. Gaines' office hoping to persuade the fisheries' captains to rescue the refugees. Everyone concerned was conscious that there could be legal requirements imposed before the refugees could be brought

into this country. Because her office was literally packed with between twenty and thirty people wanting the information, with another 100 or so persons just outside the door of her office, Ms. Gaines called the United States Customs office to determine what the proper procedure would be for the trip. When she hung up the phone the people in the room asked what customs had said. She replied, "Pickup papers [from Customs] and fill them out before going and then report [to customs] on return." Ms. Gaines then sent a runner to the Customs office for the proper papers. The runner returned within thirty minutes and the papers were distributed to 100 or so people. As the excitement mounted Ms. Gaines assisted some of the people in filling out the forms while other captains left immediately for Mariel. She noticed from her window that a uniformed customs officer was on the dock assisting other people with preparation of the forms and seeing the Mariel-bound boats off. This scene was repeated several times over the following few days as the [pandemonium] spread.

Mr. Dewey Lyden was an experienced merchant marineman who was approached to assist in the rescue of refugees. He was aware that other boats were going to Mariel and of the general approval by the U.S. authorities. On 5 May, 198[0], he contacted the U.S. Coast Guard and explained that he wanted to go to Mariel to bring back refugees. The Coast Guard stated that that was permissible and wished him well. Mr. Lyden departed for Mariel on 6 May, ... and he checked with the Coast Guard Cutter Viglant [sic] on 7 May ... to insure that it was permissible for him to bring refugees back to this country. The Coast Guard again wished him well.

Upon arrival at Mariel, Mr. Lyden found a crowded harbor with one [bottlenecked] entrance/exit guarded by Cuban gun boats. Understanding that President Castro had agreed to the release of the refugees, Mr.

---

**6.** In previous cases we have refrained from this decision because the facts in those cases would not have supported a finding of estoppel. *Deltona Corp. v. Alexander,* 682 F.2d 888, 892 (11th Cir.1982); *United States v. Context-Marks Corp.,* 729 F.2d 1294, 1297 (11th Cir.1984). *See Heckler v. Community Health Services,* 467 U.S. at 60 & n. 12, 104 S.Ct. at 2224 & n. 12.

Lyden entered the harbor in spite of the presence of the gun boats. [Inside,] he found about 1,250 American boats waiting to be loaded with refugees. The harbor was under constant [surveillance] by armed militiamen on the docks and by patrol boats roving among the Americans. On the high ground surrounding the harbor the Cuban militia had stationed tanks with their guns pointed into the harbor at the American boats.

Mr. Lyden arrived on the 8th of May expecting to be loaded quickly and to return home directly. Instead, he found a long frustrating [procedure] that required him to wait at the beck and call of the Cuban militia. He was not allowed to leave the harbor until 30 May. Sometime during the waiting period, Mr. Lyden heard President Carter announce over the Armed Services Radio Network that refugees should no longer be brought to the United States. Mr. Lyden was aware that the "Beverly G" had subsequently attempted to run from the harbor so as to avoid being loaded with refugees. The Cuban gunboats stopped the ["Beverly G"] about seven miles from the harbor and forced her back. There were believable rumors that the "Beverly G" had been fired on by the gun boats.

When it came time for Mr. Lyden's boat to be loaded he protested the loading and the number of people being loaded. He was threatened with fine or imprisonment if he did not comply with the militia's demands. The boat was loaded to three times its safe capacity and, the next morning, Lyden was allowed to leave for Key West. The return trip was a nightmare. A heavy storm caused fourteen foot seas that continuously threatened to swamp the boat. Mr. Lyden stood at the helm for twenty-three hours fighting the sea. Part of the way back he ran in consort with the U.S. Navy mine sweeper # 490 which had two refugee boats in tow. He assisted the navy by observing the other boats as they were towed.

Mr. Lyden first contacted the U.S. Coast Guard when he was fifteen miles away from Cuba. At about 80 miles from Key West he radioed the Coast Guard and stated that he was returning to Key West with refugees. When he reached Key West the U.S. authorities unloaded his boat within twenty minutes and prior to questioning anyone about whether the passengers were documented.

Mr. Lyden had entered upon the task considering himself to be performing an act of kindness and thinking that he would be [regarded] as a humanitarian. Instead, he was fined $87,000.00 and his boat has been confined to his dock since 31 May, 1980. The economic waste of not being allowed to operate his commercial vessel is regrettable. That loss alone more than offsets the fines imposed. It is equally unconscionable that upon setting foot on American soil Mr. Lyden was read his constitutional rights and treated as a common criminal when all his actions had been made known to and condoned by the U.S. authorities.

When Elio Alzugaray learned that it was possible to go to Cuba and bring back his relatives, he contacted the customs office and the Coast Guard and was told that he could go. He left for Mariel between the 20th and 25th of April and returned to Key West after a fifteen to sixteen day stay at Mariel. The conditions that he encountered at Mariel were the same as those reported by Mr. Lyden except that Mr. Alzugaray also noticed Cuban [helicopter] gun ships patrolling the harbor. Mr. Alzugaray explained that on his way back to Key West he learned that people were being fined for returning with refugees. However, he interpreted that to mean that the people being fined had not obtained proper authority before leaving. Since Mr. Alzugaray thought that he had proper authority for his trip, he did not expect to be fined. His reasoning was that if you come up to an intersection and the traffic signal is red you are required to stop. However, if there is a policeman at the intersection that tells you that you may [disregard] the red light, you may do so without penalty. Normally there were red lights preventing his bringing refugees for Cuba to the United States. But at the time he went to Mariel the U.S. authorities advised him that he could disregard those red lights.

George Rockett is a charter boat captain who regularly leaves U.S. waters for Bimi-

ni. His normal procedure was to contact U.S. Customs before departure and upon return. When he was asked by clients to make this trip he spent two days contacting customs and Coast Guard officials in Key West and Marathon. After a local official contacted his superiors in Washington, D.C., Mr. Rockett was advised that he could go to Mariel for refugees and that the only restriction was that upon return he had to clear through Key West.

On the trip to Mariel, Mr. Rockett was contacted by the U.S. [Coast Guard] just off Cuba and was asked to tow a boat into the Mariel harbor. Once inside, he was subjected to the same conditions discussed previously. He was prevented by the Cuban militia from counting the exact number of refugees loaded on his boat. He intended to do that upon his arrival at Key West but there the U.S. authorities removed his passengers at gun point and over his protests without his being able to count the passengers or discuss their proper entry into the United States. Interestingly, there were no immigration service officers present when Mr. Rockett arrived and the customs officials handled the entire process as a matter of due course.

David Law's experience is a little different than some of the others in that while at Mariel he tried to leave the harbor without refugee passengers. The Cuban gunboats stopped him at the mouth of the harbor and forced him to return to the docks for passengers.

Charles McCarthy was told by the Key West and Marathon Coast Guard and Customs officials that all formalities had been waived concerning the entry of the refugees because of the emergency situation. The only requirements that he was to comply with were to fly a quarantine flag, insure that each refugee had an exit visa and return to a port of entry. When he attempted to verify that the refugees being loaded on his boat had exit visas a militiaman pointed a bayonetted gun at him and told him to sit down and shut up. Just outside U.S. waters, Mr. McCarthy radioed the Coast Guard and asked permission to enter Key West harbor with Cuban refu-

gees. The Coast Guard gave him permission to enter and then escorted him into the harbor. He was then detained in a small room while the authorities unloaded the boat. The woman who presented him with the Notice of Intent to Fine for $161,000 told him that the document was not important. She either made that statement because she did not believe that the fine would be imposed, under the circumstances, or she deliberately lied.

Mr. Medardo Valdes and Mr. Juan Paan tell one very revealing story originating from the United States Courthouse in Key West. One day in April, three to four hundred people had gathered outside the U.S. Customs office in the Key West Courthouse. A government official emerged form the office and quieted the [chaos] for just a second. He told everyone present that his office did not have enough [personnel] to process all the necessary paperwork for the trip so his superiors had waived all formalities for the return of the refugees. The only requirement imposed was that the refugees enter the United States through Key West. The atmosphere in Key West, if not all of South Florida, was excited [chaos]. The Cuban/American community finally saw a chance to rescue its relatives and friends from Fidel Castro. The U.S. government was unable to handle the immigration efficiently and consciously changed policies and procedures daily. The customs agent's statement at the Courthouse is indicative of this inability to handle the situation administratively.

The government attempted at trial to prove that written notices prohibiting the trips were posted so as to warn these plaintiffs. However, all plaintiffs denied having seen the notices and the government did not call witnesses to testify that the notices had been posted. What the witnesses were aware of was that the newspapers and the radio were saying that they could go to Cuba for the refugees and all the government officials who were contacted, and who were contactable, confirmed that fact. George Rockett even transported two Time-Life reporters who were told by their superiors in Washington that the trips were cleared by the U.S. government.

Finally, it may be important that all these plaintiffs were humanitarians who either went after family members or who were asked by Cuban/Americans to rescue their family members. Some of the captains were paid their expenses and lost income but none of these captains can be classified as pure mercenaries doing what they knew was illegal simply to make a large profit. It is also important that all of these captains left for Mariel well before the President announced his embargo on further immigration. These captains were trapped inside Mariel harbor when the embargo took effect and had no choice but to load their boats and leave Mariel in spite of the embargo.