The UNITED STATES of
America, Plaintiff,

v.

Kedede Halie Michael DAGNACHEW,
Defendant.

Cr. A. No. 92–CR–304.

United States District Court,
D. Colorado.

Dec. 8, 1992.

Greg Graf, Asst. U.S. Atty., Denver, CO,
for U.S.

Janine Yunker, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BORCHERS, United States Magistrate Judge.

THIS MATTER came before the Court for trial on November 25, 1992. Present were the following: Greg Graf, Assistant United States Attorney; Janine Yunker, attorney for Defendant; and Defendant. The Court heard the testimony of witnesses for the defense and prosecution, received the stipulation of the parties, and took the matter under advisement. Further argument will be waived.

### I.

This case presents unusual facts and a legal issue of first impression. From the evidence presented, the Court finds the following to be the facts. Defendant is a citizen of Ethiopia. He was born and raised in that country, primarily living in Addis Ababa, the capital.

Though Ethiopia is an old nation in comparison with most on the African continent, the vestiges of tribalism remain. Defendant's father was from Eritrea, a separate and distinct region in the country that borders on the Red Sea. Eritrea has been for several years the site of a war of independence. The people of that region speak a separate language from the rest of the country.

Defendant's mother is Amharan. This group of people speak Amharic which has been the official language for centuries in the country. The Amhara people have controlled Ethiopia for a long period of time, and those who wished to become part of the government were required by necessity to learn and master the Amharic language.

Prior to 1974, Ethiopia was ruled by a monarchy. Emperor Haile Selassie ruled for decades in Ethiopia. The history of the nation was marked by the Italian invasion from Eritrea at the beginning of World War II. This invasion was sparked by the

desire of Benito Mussolini to build an empire. Though Ethiopia came under Italian and Axis control for a period of time, that control was not complete due to the rugged mountainous terrain of the country. Emperor Selassie returned to his throne in 1944.

From 1944 to 1974, Haile Selassie ruled Ethiopia. The government was denominated by Amharan people. The government was absolute, but was viewed favorably in this country because of its pro–West leanings. That view was not to continue after the revolution in 1974.

Ethiopia was and is an economically underdeveloped country. The underlying causes of the revolution in 1974 are not totally clear to the Court, but it is clear that Haile Selassie had lost the respect of many of his countrymen and had not improved the average person's economic lot. The revolution was sparked by military unrest. Selassie was forced from power but remained under house arrest in Ethiopia until his death. The military then began an internal fight to determine who would rule the country.

The revolutionary government first set up a ruling body called the Dergue. Much like an executive committee, this group was to rule the country and begin the changeover from a monarchy. As is often the case where traditions or structures of government have been limited, the internal struggles for power devolved into a fight for supremacy. The end result was the emergence in 1976 of Lieutenant Colonel Mengistu as the head of state. Mengistu would rule until May, 1991 when his government would collapse and be forced from power.

Defendant was born in 1965 in Addis Ababa. His mother and father separated early in his life, and he was raised primarily by his mother. Defendant testified as to his recollections of the 1974 revolution. He

recalled primarily the military presence and then the change downward in the standard of living. He testified further as to his being questioned about his early political involvement and being tortured at the hands of Mengistu's secret police. He would remain in Ethiopia until 1985 when he came to this country on a student visa. He was then twenty years old.

Testimony was presented from two other witnesses by Defendant concerning the situation in Ethiopia. Belachew Jemanah is now an American citizen living and working in Washington, D.C. He was originally from Ethiopia and worked for Emperor Selassie, as well as the revolutionary government. Mr. Belachew is an extremely well-educated individual, having received a LL.M. from Georgetown in the early 1960's. He testified as to the past and present status of his native country. He detailed the purges that occurred under the Mengistu regime. He testified that he departed from Yugoslavia while the Ethiopian ambassador to that country. Mr. Belachew had previously been Ethiopia's ambassador to Turkey, as well as a high ranking official of Ethiopia's security police.

Mr. Belachew's testimony, which the Court finds totally believable, dealt primarily with the events of May, 1991. He has been able to keep up with information from Ethiopia through correspondence with people in that country, as well as with contact with those who have left. Prior to May, 1991, the Mengistu regime had been involved in numerous wars with ethnic groups seeking independence from the main government in Addis Ababa. The best known war was that in Eritrea which had been ongoing for two decades. Less well known was the war in Tigre province. This province lies between the capital in Addis Ababa and the province of Eritrea.[1]

Mr. Belachew described the collapse of the Mengistu regime and the takeover of

---

**1.** Undiscussed throughout the trial was the war in the border region with Somalia in the early 1980's. The Mengistu regime fought with Somalia for a period of time. The war effort there, as

well as in Eritrea, was supported by a vast influx of then-Soviet advisors, as well as Cuban troops. The Mengistu regime had at one point

power by the Tigrean Liberation group.[2] The result in May, 1991 was a systematic purge from power of those previously associated with the Mengistu regime, as well as persecution of the Amharan people. The purges under the new regime were not dissimilar to those under the old regime, except the victims had changed. Mr. Belachew indicated that any person of Amharan ancestry would be subject to persecution in Ethiopia at the present time.

Defendant also presented Tamrat Engudra as a witness. This individual presently lives in Daly City, California. He is Ethiopian. He also described the information that he has been receiving from his native country concerning the Tigrean government. He noted that Amharan people are being persecuted.

Defendant arrived in 1985 in the United States on a student visa. He described in his testimony how his mother had to bribe an official to get him a passport. He arrived in this country, but did not attend much school. He and his mother had viewed the departure from Ethiopia as a matter of necessity and survival. He described how his brother had been conscripted into the army in Ethiopia but later escaped. His sister died in 1984, but had been tortured previously by the secret police. He understands from all available information that he will be subjected to persecution and possible execution if returned to Ethiopia.

In 1989, the Immigration and Naturalization Service (INS) had begun expulsion proceedings against Defendant. This was based upon his failure to go to school and his employment in the United States, in violation of his student visa. Defendant made application for political asylum. That matter was heard by an administrative law judge on November 15, 1989. The judge denied the application. An appeal was then taken *pro se* by Defendant to the Board of Immigration Appeals (BIA). That appeal

the largest and best equipped military in Africa, save for the military forces of South Africa.

**2.** Mengistu has been given asylum in Zimbabwe where he now lives.

was denied summarily because of the conclusory allegations placed into the petition by Defendant. Prosecution Exhibit 1–A. That denial occurred on June 3, 1991. Defendant was then ordered taken into custody, but was given time to arrange a voluntary departure. That voluntary departure did not occur.

Defendant was arrested in Salt Lake City and transported to Denver. He was placed into the Wackenhut facility in Aurora, Colorado. This facility, though privately run, is on contract with INS to provide a holding facility for deportable individuals and others under INS control. *See* Prosecution Exhibit 3. Defendant stipulated at trial that he was in control of INS at the Wackenhut facility and that he escaped on October 1, 1991.[3]

Defendant escaped from the Wackenhut facility by shoving a cart into a guard, Randy Deal, and fleeing out the door. Defendant was then arrested in Salt Lake City in September, 1992 and returned to Colorado to face these proceedings. Though there was some testimony concerning further INS proceedings dealing with reconsideration of the asylum/withholding of deportation petition, that is not germane to the discussion in this case.

Defendant's stipulation established all elements of the prosecution case. The only defense raised by Defendant, duress and necessity, is what is at issue in this case.

## II.

This case appears to be one of first impression. The cases cited by both the prosecution and defense deal with the normal prison escape case as it involves a duress and necessity defense. No cases have been found by the Court that deal exactly with the issue presented here.

Defendant is charged with violation of 18 U.S.C. § 751(a). This statute reads as follows:

**3.** The Court determined on the record that Defendant understood that the stipulation he was entering into would establish a prima facie case for the prosecution. He said that he understood this and wished to go forward with the stipulation.

Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or commissioner, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined not more then $5,000 or imprisoned not more than five years, or both or if the custody or confinement is for extradition, *or for exclusion or expulsion proceedings under the immigration laws,* or by virtue of an arrest or charge of or for a misdemeanor, and prior to conviction, be fined not more than $1,000 or imprisoned not more than one year, or both. (emphasis added).

The language that is emphasized, which makes it a criminal offense to escape while being held for exclusion or expulsion under immigration laws, was added to the statute by Pub.L. 100–690 (November 18, 1988). This section is of recent vintage, and no reported cases interpreting the section have been cited by counsel or found by the Court.

Defendant has conceded that he escaped from the INS facility and was under the custody of the Attorney General. He has raised the defense of duress and necessity. In essence, he has argued that he faced a choice of evils. He could remain in the facility and be deported, facing persecution and possible execution upon his return to Ethiopia, or he could escape, face a possible criminal charge, but also possibly remain at liberty for some extended period of time.

The problem facing this Court is very different than that posed by the parties to this case. Cited to this Court have been various cases dealing with the defense of duress to an escape charge. The most recent case from the United States Supreme Court is *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Neither this case nor the others cited deals with the issue of whether duress and necessity (as well as choice of evils) can be raised as a defense to an escape charge from an INS facility, where the duress involved is the ultimate governmental act—deportation, and not the conditions in the facility itself.

In *Bailey,* the United States Supreme Court was faced with determining the validity of a duress defense that arose out of an escape from the District of Columbia jail. Each of the defendants raised the conditions at the jail as the reason that they escaped. The trial court refused to allow the defense to be presented to the jury. The Court of Appeals for the District of Columbia Circuit reversed. The petition for certiorari was granted.

The Supreme Court spent time in its opinion discussing the necessary *mens rea* required for conviction for escape under 18 U.S.C. § 751(a). The Court held that "the prosecution fulfills its burden under § 751(a) if it demonstrates that an escapee knew his actions would result in his leaving physical confinement without permission." *Id.* at 408, 100 S.Ct. at 634.

The Court then dealt with the defenses of duress and necessity. The Court found that these defenses have become blurred and are basically one. *Id.* at 409, 100 S.Ct. at 634.

We need not speculate now, however, on the precise contours of whatever defenses of duress or necessity are available against charges brought under § 751(a). Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defenses will fail. (cit. omit). Clearly, in the context of prison escape, the escapee is not entitled to claim a defense of duress or necessity unless and until he demonstrates that, given the imminence of the threat, violation of § 751(a) was his only reasonable alternative.

*Id.* at 410–411, 100 S.Ct. at 634. In *Bailey,* the issue became one of continued escape

status. The defendants had not turned themselves in to another official upon completion of the escape from the jail. The Court held that before a duress case may be considered by a jury, "an escapee must first offer evidence justifying his continued absence from custody as well as his initial departure." *Id.* at 412, 100 S.Ct. at 635.

The Court rejected the duress and necessity defense in *Bailey* because of the continued absence from a facility and a failure to show a "..bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force." *Id.* at 413, 100 S.Ct. at 636. Escape is a continuing offense, unlike most criminal charges. Under *Bailey,* there is requirement now that any prison who escapes must show an attempt to turn himself in to authorities after departure from the facility where he claims that he was in danger.

The *Bailey* case, as well as others cited by the parties, provides only general guidance for this Court. *See, United States v. Bifield,* 702 F.2d 342 (2d Cir.1983), *cert. den.* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304; *United States v. Garza,* 664 F.2d 135 (7th Cir.1981), *cert. den.* 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854; *United States v. Boomer,* 571 F.2d 543 (10th Cir. 1978), *cert. den.* 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 411. The question, then, is whether duress and necessity may be raised as a defense to a charge of escape from custody of the Attorney General when such custody is for exclusion or expulsion under appropriate immigration laws. The answer certainly would be in the affirmative if the conditions within the facility were such that a threat to personal safety existed. For an example, if an individual had been threatened with bodily harm, had reported the threats to officials, and nothing had occurred in response to the pleas for help, then duress could be raised as a defense, assuming the defendant turned himself in to another official after escaping.

The situation is different when the ultimate act of deportation raises the alleged duress. Turning oneself in after escape does not rectify the alleged threat, as deportation will still occur. Thus, the *Bailey* analysis does not address the issue here. A legitimate argument can be made that duress or necessity cannot be raised as a defense to an escape charge when deportation is the harm being escaped from. Such an argument must be rejected in light of *Bailey* and its directive that the "precise contours of the defenses of duress and necessity" must be reviewed as they arise.

■ This Court holds that the defense of duress and necessity may be raised by a defendant to an escape charge where the harm is deportation. Further, there must be a showing of persecution or personal harm that awaits the defendant if he or she is deported. There must also be a showing that no reasonable legal alternative exists to the escape.

In so holding, this Court notes that duress has been allowed as a defense in one other area of immigration law. Under 8 U.S.C. § 1323, INS has the authority to order fines and confiscation of boats, planes, etc. for the illegal importation of undocumented aliens. Duress has been allowed as a defense. *United States v. Blanco,* 754 F.2d 940 (11th Cir.1985); *Lyden v. Howerton,* 783 F.2d 1554 (11th Cir. 1986); *United States v. Garcia,* 844 F.2d 1528 (11th Cir.1988). The Eleventh Circuit has allowed this defense to be raised to assessed fines or confiscation provided that: (1) there was an immediate threat of death or serious bodily injury; (2) a well grounded fear that the threat would be carried out; and (3) no reasonable opportunity to escape. *Lyden,* 783 F.2d at 1557. The *Lyden* case, as well as *Blanco,* dealt with the Muriel boatlift from Cuba in 1980. INS had assessed substantial fines and forfeitures against private boat owners who had gone to Cuba to bring people to the United States. Some evidence was presented that the American government had initially acquiesced in the boatlift, but then changed its mind. The boatowners argued that Cuban officials had threatened them if they did not take people from that nation to the United States. INS had taken the position in its administrative proceedings that

duress could only be used in mitigation, but not as an absolute defense. The Eleventh Circuit rejected that interpretation of the law.

Further, *Bailey* makes clear that duress and necessity are common law defenses. *Id.* at 409–410, 100 S.Ct. at 634. Congress could have chosen to preclude the use of these defenses in an immigration escape case. It chose not to do so, thus leaving it to the judicial system to analyze each case on its own merits.

### III.

■ The question then is whether this Defendant has sufficiently raised the defense of duress and necessity. Further, if it is sufficiently raised, has the prosecution then overcome it on rebuttal?[4]

The evidence presented in this case is conflicting at certain points. The prosecution has made much of the differences in the testimony given at trial by Defendant and that given by him in 1989 at his deportation hearing. At that time, the administrative law judge chose not to believe much of what Defendant testified about, especially concerning his mother and her legal problems in Ethiopia that arose out of the passport being obtained for Defendant. The administrative law judge believed that Defendant had "made up a good deal of this story." (Prosecution exhibit 6, p. 5).

This Court had been asked not to relitigate the immigration case. The present or future status of Defendant in regards to INS is not before this Court, only whether he should be found guilty of the charge of escape and whether he has raised a valid and sufficient defense of duress or necessity. Indeed, nothing this Court does will affect his deportability. That decision remains with INS.

What has been presented to the Court reflects the status of Defendant and his native country as of November 25, 1992. Even the administrative law judge conceded in 1989 that "I know for a fact that

Ethiopia has a miserable human rights record. People are punished for leaving the country illegally." (Prosecution Exhibit 6, p. 5). What the situation was in November, 1989 is not the situation now. Defendant's mother has fled the country, even though she once was an assistant to the mayor of Addis Abada. The revolution of May, 1991 places this case in a very different context than if the Mengistu regime were still in power.

This Court has listened and weighed the testimony of all defense witnesses. The Court finds them to be believable. The testimony of Mr. Belachew is enlightening, and the Court finds that the Amharan people are now the subject of persecution by the Tigrean government that is in power in Addis Ababa. The Court further finds that Defendant is half Amaharan, but would be perceived as being fully Amharan upon his return due to his linguistic native tongue and previous family connections.

Defendant has raised a "well-founded fear of persecution" as that term has been used in asylum cases. *See, I.N.S. v. Cardoza Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Defendant need not prove that it is absolute that he would be harmed or killed upon his return to Ethiopia. Likewise, he has presented evidence that is believable and more than mere supposition that he would be subject to persecution. *See, I.N.S. v. Elias Zacarias*, —— U.S. ——, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

The prosecution raised at trial the issue of other avenues of approach short of escape. Yet, Defendant was in custody. His appeal to BIA had been summarily dismissed. No notice was provided to as to any right of appeal to the United States Court of Appeals. Defendant perceived that he had no legitimate legal remedy at the time.

Further, the prosecution argued that two additional reasons exist for denying the defense of duress and necessity. First,

---

**4.** The stipulation of the parties, as well as the submission of prosecution exhibits 1 through 6, alleviated any need for a prosecution opening case. The prosecution did offer rebuttal evidence. Certainly, the overcoming of any duress and necessity defense may be predicated on consideration of all evidence presented by the prosecution.

Defendant did not immediately turn himself in to another official. As discussed previously, this point is valid in the normal prison escape case, but makes no sense in the case where the ultimate harm is deportation and persecution upon return to the another country. The test in *Bailey* is not rigid.

Second, the use of force, it is argued, strips Defendant of the ability to use this defense. It has been stipulated that a cart was shoved into Randy Deal, the guard at the Wackenhut facility. This may technically constitute an assault, though Defendant is not before this Court on an assault charge. The cart incident, with a subsequent escape through an open door, does not rise to the level that would require stripping of this defense. Certainly, a defendant is responsible for his or her own actions during an escape. Serious injury to a guard or other official cannot and will not be excused. That is not the case here.

Finally, the prosecution argues that accepting this defense will only mean that other detainees will have no incentive not to escape. This concern is legitimate, but it is important not to read too much into this case. Each case is unique. An INS detainee will have an almost impossible task of raising this defense to a deportation to Canada or Western Europe. In this case, the administrative law judge of INS took judicial notice that Ethiopia's human rights record is abhorrent.[5] The situation has dramatically changed since the May, 1991 revolution. The impact of that revolution is not at issue, nor has the prosecution seriously argued that Defendant, as a Amharan, still is part of the in-group within the government.

Based upon the unique facts of this case, the Court finds that Defendant has raised a bona fide defense of duress and necessity. The prosecution has failed to overcome that defense with evidence showing guilt beyond a reasonable doubt. Defendant had on October 1, 1991 a legitimate fear that he would be persecuted and harmed if deported to Ethiopia. He further perceived that he had no other legal recourse in light of the summary dismissal of his appeal to BIA.

IT IS HEREBY ORDERED that Defendant is acquitted of the charge of escape under 18 U.S.C. § 751(a); and

IT IS FURTHER ORDERED that Defendant shall be released to the custody of INS.

---

5. The entire area that includes and surrounds Ethiopia is in upheaval. Somalia has become a textbook example of what anarchy looks like. That situation, not dissimilar to that in parts of Ethiopia, has prompted United Nations' action that will entail in excess of twenty thousand American servicemen and women. The chaos of Somalia has reached a point where the rest of the world cannot stand idle. Likewise, the civil war in the southern part of the Sudan, based upon religious and ethnic persecution, continues. Even the prosecutor in this case has described Ethiopia as place he would not want to return to.